ORIGINAL

NOV 07 2012

CAUSE NO. DC-12-12882

FILED
2012 NOV -1 AM 9:23
GARY FITZSIMMONS
DISTRICT CLERK
DALLAS CO., TEXAS
SHAZZNIC BECK DEPUTY

| | | |
|---|---|---|
| Murchison Capital Partners, L.P., Robert Murchison, Dr. Alan Hull, MD, Back Nine Investments, Ltd., Douglas Keller, Heather Powell, Jimenez Dynasty Trust, John Purtell, Thomas White, David F. McCool, Katherine McCool, Brian McCool Trust, Troy McCool Trust, Dr. Martin White, MD, Martin Gay White IRA Rollover, Michael Sloan, Pat Sullivan, Cyndee Sullivan, Pat Foley, Paul Jenkins, Pedro Vergne, Purtell Business Ventures, Ltd., Scott Roulet, John M. Purtell Jr. Family Irrevocable Trust, XPX MNGT. L.L.C., | § | IN THE DISTRICT COURT |
| *Plaintiffs,* | § | |
| v. | § | OF DALLAS COUNTY, TEXAS |
| Nuance Communications, Inc., | § | |
| *Defendant.* | § | 44th JUDICIAL DISTRICT |

## PLAINTIFFS' ORIGINAL PETITION AND JURY DEMAND

Plaintiffs submit this Original Petition and Jury Demand against Defendant Nuance Communications, Inc., as follows:

## I.
## OVERVIEW

Plaintiffs bring this action against Defendant Nuance Communications, Inc. for securities fraud under the Texas Securities Act to recover damages arising from Nuance's fraudulent inducement of Vocada, Inc. and its former stockholders into a merger agreement—a fraud that Nuance has already been found to have perpetrated. By making

material, written misrepresentations prior to the merger with the intent to induce Vocada's board to approve the merger and sell Vocada's stock, Nuance effectively acquired the entirety of Vocada's stock for $20 million—far below the fair market value for Vocada's stock at the time of the sale.

Nuance is a global computer software corporation with annual revenues that exceeded $1.2 billion last year. In 2007, Nuance acquired Vocada, a privately held, high-growth SaaS software company that sold *Veriphy*™ software to hospitals and radiologists throughout the United States. Nuance provided $20 million in initial consideration to the Vocada stockholders in exchange for their agreement to sell their Vocada shares by way of a two-step merger. Prior to the sale, Nuance issued a "side letter," purportedly authored by the President of Nuance's Healthcare Division, that contained a series of written representations regarding Nuance's intended operation of the Veriphy business post-closing. Vocada's board and stockholders approved the merger in reliance on the representations contained in the side letter. The sale closed on or about November 2, 2007, and funded on or about November 5, 2007.

On October 5, 2012, in a separate arbitration action relating to a post-merger "earn out" provision in the Merger Agreement, a three-member arbitration panel concluded that Nuance committed fraud by inducing Vocada's board into the merger through material misrepresentations of fact contained in the side letter, and that, but for the misrepresentations, Vocada's board would never have approved the merger. Vocada's stockholders seek damages under the Texas Securities Act in an aggregate amount that is not less than $20 million, calculated as the value of the Vocada stock at the time of sale to

Nuance, plus the amount of any income Nuance received on the Vocada stock, less any consideration Nuance paid for the Vocada stock, plus interest at the legal rate from the time of the sale. Plaintiffs also seek exemplary damages, reasonable and necessary attorneys' fees, costs, and all other legal or equitable relief to which they might be entitled.

## II.
## DISCOVERY

1. Discovery in this case is intended to be conducted under Level 3 of Rule 190.4 of the Texas Rules of Civil Procedure.

## III.
## JURISDICTION

2. This Court has jurisdiction over this matter because the amount in controversy exceeds the minimum jurisdictional limits of the Court.

## IV.
## VENUE

3. Pursuant to Chapter 15.002(a)(1) of the Texas Civil Practice & Remedies Code, venue is proper in Dallas County because it is the county in which all or a substantial part of the events or omissions giving rise to the claim occurred.

## V.
## PARTIES

4. Defendant Nuance Communications, Inc. ("Nuance") is a Delaware corporation that, on information and belief, maintains its principal place of business at

1198 East Arques Ave., Sunnyvale, California 94085.[1] Nuance can be served through its registered agent for service of process in Texas: CT Corporation System, 350 N. St. Paul St., Suite 2900, Dallas, Texas 75201-4234.

5. Plaintiff Murchison Capital Partners, L.P. is a Texas limited partnership.

6. Plaintiff Robert Murchison is an individual residing in Texas.

7. Plaintiff Dr. Alan Hull, MD is an individual residing in Texas.

8. Plaintiff Back Nine Investments, Ltd. is a Texas partnership.

9. Plaintiff Douglas Keller is an individual residing in Indiana.

10. Plaintiff Heather Powell is an individual residing in Texas.

11. Plaintiff Jimenez Dynasty Trust is a trust whose trustee, Tony Jimenez, is a resident of Texas.

12. Plaintiff John Purtell is an individual residing in Texas.

13. Plaintiff Thomas White is an individual residing in Texas.

14. Plaintiff David McCool is an individual residing in Texas.

15. Plaintiff Katherine McCool is an individual residing in Texas.

16. Plaintiff Brian McCool Trust is trust whose trustee, Katherine McCool, is a resident of Texas.

17. Plaintiff Troy McCool Trust is trust whose trustee, Katherine McCool, is a resident of Texas.

18. Plaintiff Dr. Martin White, M.D. is individual residing in Texas.

---

[1] Nuance was formerly known as ScanSoft, which acquired Nuance Communications, Inc. in 2005 and took on its name. At the end of fiscal year (FY) 2011, Nuance reported $1.3 billion in revenues and had a market cap of approximately $7.4 billion.

19. Plaintiff Martin Gay White IRA Rollover is an individual retirement account whose trustee is Charles Schwab Corporation, a Delaware corporation.

20. Plaintiff Michael Sloan is an individual residing in Texas.

21. Plaintiff Pat Sullivan is an individual residing in Arizona.

22. Plaintiff Cyndee Sullivan is an individual residing in Arizona.

23. Plaintiff Pat Foley is an individual residing in Texas.

24. Plaintiff Paul Jenkins is an individual residing in Texas.

25. Plaintiff Pedro Vergne is an individual residing in Texas.

26. Plaintiff Purtell Business Ventures, Ltd. is a Texas domestic limited partnership.

27. Plaintiff Scott Roulet is an individual residing in Texas.

28. Plaintiff John M. Purtell Jr. Family Irrevocable Trust is a trust whose trustees, John and Sharron Purtell, are residents of Texas.

29. Plaintiff XPX MNGT L.L.C. is a Georgia limited liability company.

## VI.
## FACTUAL BACKGROUND

### A. *Vocada's Inception*

30. In 2001, brothers Peter and Tom White founded Vocada to develop, market, and sell software named *Veriphy*™ to enable hospitals, including radiology and cardiology labs, to report and track critical test results to referring physicians through an automated system. The Whites—the sons of a Dallas-based physician—seeded Vocada through funds from "friends and family" in exchange for equity in the company.

31. After several years in development, Vocada began selling Veriphy to hospitals and radiology departments. From 2004 through 2006, Veriphy's annual revenues doubled each year, and revenues were on their way to doubling again in 2007 and were projected to exceed $4 million. Veriphy attracted lots of attention and even received an endorsement from JCAHO—the Joint Commission on Accreditation of Healthcare Organizations—which had identified timely reporting of critical test results as an important focus to improve patient safety.

*B. Nuance seeks to acquire Vocada.*

32. In late 2006, Nuance and Vocada explored the possibility of entering into a "reseller" relationship wherein Nuance's enormous Healthcare Division would sell Veriphy to its customers and keep a reseller margin on each sale. Vocada, as a "SaaS" software company on a steep growth path, however, became more attractive to Nuance's aggressively expanding Healthcare Division as an acquisition target.

33. In April 2007, Nuance approached Vocada about a potential business combination and solicited basic information about Veriphy's historical revenues and customers. Over the next several months, Vocada CEO Peter White worked with Nuance's representatives to develop projections for a combined company while Nuance's Corporate Development team and analysts evaluated and created internal projections to evaluate Nuance's acquisition of Vocada.

34. Between April and June 2007, Vocada's officers met with Nuance's representatives to discuss the details of a possible merger. In July 2007, Nuance ultimately tendered a non-binding letter of intent for a contemplated merger, proposing a

total of $45 million in potential "Merger Consideration," with an initial $20 million in cash or stock going to the Vocada stockholders and $4 million in cash or stock going to employee retention and management bonuses, and an additional $21 million in contingent "Earnout Consideration" conditioned on Veriphy revenues hitting certain targets over a three-year period post-closing.

### C. *Vocada specifically requests Nuance's commitment to invest in Veriphy sales.*

35. Vocada's board members would never have authorized the sale of 100 percent of Vocada's stock, or recommended the sale of that stock to the Vocada shareholders, for only $20 million in consideration. To the contrary, based on Vocada's owners' valuations, high-growth, high-margin SaaS software companies like Vocada were, at the time, trading at multiples of 10 times annual revenues. With projected revenues in 2007 of between $4 and $4.5 million, Vocada's board members valued the company at no less than $40 million.

36. It was therefore crucial to Vocada's board that Nuance expend every effort to maximize the "Earnout Consideration" post-closing, because after the merger, the sales and revenues for the Veriphy product—and with them, the achievement of the revenue hurdles for the Earnout Consideration—would be entirely within Nuance's control. Unless most of the Earnout Consideration could be earned after Nuance took control of Veriphy sales, Vocada's stockholders would have forfeited their ownership of Vocada for millions below its fair market value.

37. Over the months following the July 2007 Letter of Intent, then, Vocada CEO Peter White and Vocada's counsel negotiated a final, binding Merger Agreement

with Nuance, placing an overriding emphasis on Nuance's assurances that it would commit the necessary capital and resources to achieving the full Earnout Consideration post-closing. In September 2007, at Vocada's request, Nuance's deal team and Vocada CEO Peter White conferred to specifically discuss Nuance's commitment of capital and resources post-closing.

### D. *Nuance provides Vocada's board with a "Side Letter" containing Nuance's purported intentions to commit resources to selling Veriphy and achieving the earnout.*

38. On October 12, 2007, contemporaneous with the almost-final draft of the Merger Agreement, Nuance's transactional counsel and Fred Heller forwarded to Vocada's counsel and board members an "Earnout Side Letter" on Nuance's letterhead that purported to be from John Shagoury—the then-President of Nuance's Healthcare Division.

39. Among Nuance's specific representations in the Side Letter were:

- Nuance *intends to fully pursue the Veriphy business* and considers the achievement of the earnout targets very important to the realization of the benefits of the transaction for Nuance.
- The Nuance sales force will receive full credit for all revenue attributable to sales of Veriphy products when determining compensation.
- The Veriphy products *will be managed similarly to other core Nuance product lines*, with management reviews, marketing attention, and product and feature evolution appropriate to the market conditions.

40. Vocada's board specifically discussed both the Merger Agreement and the Side Letter at Vocada's final board meeting on October 16, 2007. Based on the assurances provided in the Side Letter, Vocada's board voted to approve the merger. The board would *never* have voted to approve the Merger Agreement, or to recommend that

the Vocada stockholders agree to sell their stock in Vocada, without the representations regarding Nuance's intentions contained in the Side Letter.

41. The Merger Agreement closed on November 2, 2007, and each and every one of the Vocada stockholders sold their stock to Nuance. After closing, Peter and Tom White (and other Vocada employees) became Nuance employees and began working with Nuance's Healthcare Division to market and sell the Veriphy software.

*E. Nuance pays no "Earnout Consideration" to the Vocada stockholders, and the Stockholder Representative initiates an investigation.*

42. In June 2009, Nuance delivered to Vocada's "Stockholder Representative" under the Merger Agreement, John Purtell, an "Earnout Notice" reporting that the Vocada stockholders were due no consideration under the first $7 million tranche of the Earnout Consideration.

43. Purtell objected to the Earnout Notice and requested information from Nuance pertaining to Nuance's efforts to sell the Veriphy software post-closing. In the fall of 2009, Nuance provided a sampling of the requested information to Purtell, which Purtell continued to investigate with counsel. In April 2010, after completing the initial review of the information provided by Nuance, Purtell requested further and more specific information relating to Nuance's post-closing efforts to sell Veriphy. Nuance refused to provide the additional information.

44. In June 2010, Nuance delivered its second "Earnout Notice," informing Purtell that, again, the Vocada stockholders were due no consideration under the second $7 million tranche of the Earnout Consideration.

45. In December 2010, after completing his investigation, Purtell, on behalf of the Vocada Stockholders, initiated an arbitration proceeding against Nuance with the American Arbitration Association based on an arbitration clause in the Merger Agreement that requires disputes relating to the Earnout Consideration to be arbitrated in New York, New York.

***F. The three-member arbitration panel concludes the Nuance committed fraud.***

46. On October 5, 2012, a three-member arbitration panel appointed by the American Arbitration Association (the "Panel") ruled unanimously that Nuance fraudulently induced Vocada's board and stockholders to enter into the Merger Agreement.

47. In its Findings of Fact and Conclusions of Law—which were required under the arbitration clause in the Merger Agreement—the Panel found as follows:

- Nuance made material representations of fact in the Side Letter to Vocada's board in order to induce the board members to enter into the Merger Agreement.
- The statements were false when made.
- Vocada's board was justified in relying on the false representations contained in the Side Letter.
- Vocada's board members would not have entered into the Merger Agreement absent the assurances contained in the Side Letter.

## VII.
## CAUSES OF ACTION

**A. Violation of the Texas Securities Act—Tex. Civ. Code Ann. § 581-33**

48. Plaintiffs incorporate all prior and subsequent paragraphs as if fully restated and re-alleged here.

49. Plaintiffs are all former stockholders in Vocada, Inc. who sold their stock to Defendant Nuance Communications, Inc. on or about November 2, 2007. Certain Plaintiffs are also assignees of the claims of other former Vocada stockholders.

50. The shares of stock in Vocada are securities under the Texas Securities Act.

51. Nuance offered to buy or bought securities from Plaintiffs by means of untrue statements of material fact or omissions of material fact necessary in order to make the statements made, in light of the circumstances, not misleading.

52. Nuance is liable for damages under Section 33(B) of the Texas Securities Act due to their false statements of material fact made to Plaintiffs. Plaintiffs seek damages under the Texas Securities Act in an aggregate amount that is not less than $20 million, calculated as the value of the Vocada stock at the time of sale to Nuance, plus the amount of any income Nuance received on the Vocada stock, less any consideration Nuance paid for the Vocada stock, plus interest at the legal rate from the time of the sale.

53. In the alternative, Plaintiffs seek all relief in equity to which they may be entitled, including, but not limited to, equitable rescission, reformation, disgorgement, and the imposition of a constructive trust on Nuance.

54. Plaintiffs further seek their reasonable attorneys' fees and costs.

## VIII.
## JURY DEMAND

55. Plaintiffs request a trial of this cause before a jury of their peers in Dallas County, Texas and have tendered the jury fee with the Original Petition.

## IX.
## EXEMPLARY DAMAGES

56. Plaintiffs incorporate all prior and subsequent paragraphs as if fully restated and re-alleged here.

57. Plaintiffs further seek to recover exemplary damages from Nuance resulting from Nuance's fraud, malice, or gross negligence.

## X.
## DISCOVERY RULE

58. Plaintiffs incorporate all prior and subsequent paragraphs as if fully restated and re-alleged here.

59. To the extent necessary, Plaintiffs affirmatively plead that (a) the discovery rule defers the accrual of any causes of action brought herein because Plaintiffs did not discover the untruths or omissions until, at the earliest, 2010, and discovery should not have been made earlier by the exercise of reasonable diligence; and (b) under the doctrine of fraudulent concealment, Nuance's concealment deferred the accrual period for all causes of action until Plaintiffs discovered or should have discovered the deceitful conduct or facts giving rise to the cause of action.

## X.
## PRAYER

WHEREFORE, Plaintiffs request that this Court enter judgment against Nuance and award Plaintiffs the following relief:

(i) Damages under the Texas Securities Act, Tex. Civ. Code Ann. § 581-33B, calculated as the value of the Vocada stock at the time of sale to Nuance, plus the amount of any income Nuance received on the Vocada stock, less any consideration Nuance paid for the Vocada stock, plus interest at the legal rate from the time of the sale, in an aggregate amount not less than $20 million;

(ii) In the alternative, rescission and restitution, reformation, disgorgement, and/or the imposition of a constructive trust;

(iii) Reasonable and necessary attorneys' fees and litigation expenses;

(iv) Exemplary damages in an amount to be determined by the trier of fact;

(v) Pre-and post-judgment interest at the maximum rate allowed by law;

(vi) Costs of court; and

(vii) Such other relief, at law and in equity, to which Plaintiffs may be justly entitled.

Respectfully submitted,

Peter D. Marketos
Texas State Bar No. 24013101
Adam C. Sanderson
Texas State Bar No. 24056264
Leslie Chaggaris
Texas State Bar No. 24056742

REESE GORDON MARKETOS LLP
750 N. Saint Paul St.
Suite 610
Dallas, Texas 75201

**ATTORNEYS FOR PLAINTIFF**